**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DONALD R. PEVIA,                              *

Plaintiff                                     *

v                                             *        Civil Action No. ELH-13-2905

MICHAEL STOUFFER, et al.                      *

Defendants                                    *
                                           ***

**MEMORANDUM**

Donald Pevia, the self-represented plaintiff, is a Maryland State prisoner confined at the

North Branch Correctional Institution ("NBCI").  He filed suit under 42 U.S.C. § 1983 against

the following defendants:   NBCI Chief of Security Keith K. Arnold; Lt. Paul Pennington;

Warden Bobby P. Shearin[1]; Lt. Dale Smith; and Commissioner Michael Stouffer.  ECF 1.  He

alleges deliberate indifference to his medical needs and cruel and unusual punishment, in

violation of the Eighth Amendment to the Constitution.  ECF 1 at 5.  Defendants have moved to

dismiss or, in the alternative, for summary judgment.  ECF 15.  The motion is supported by a

legal memorandum and several exhibits (collectively, the "Motion").  Plaintiff opposes the

Motion.  ECF 17.[2]

---

[1] Shearin served as Warden until February 2014.

[2] Plaintiff was informed that the Motion could result in dismissal of his case, and of his right to respond and to submit exhibits.  *See* ECF 16; *see also Roseboro v.* Garrison, 528 F.2d 309 (4th Cir. 1975).  Plaintiff's opposition is entitled "Motion for Summary Judgment," ECF 17, and it is supported by exhibits.  The exhibits were not electronically filed as of this writing.  The Motion is in fact an opposition to defendants' dispositive motion. *See* ECF 17.  To the extent that ECF 17 is a motion for summary judgment, it is denied.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6 (D. Md. 2014).   For the reasons that follow, defendants' Motion, construed as a motion for summary judgment, shall be granted.

## Background

Pevia alleges that he suffers from a shoulder injury, arthritis, and calculi in his shoulder, which necessitates his being handcuffed in front.   ECF 1 at 3.   Plaintiff indicates that in 2011 medical personnel provided him with an order that he be double cuffed behind his back in order to minimize the pain in his shoulder.   In February 2012, this medical order was modified to provide for front handcuffing to help relieve pain in plaintiff's shoulder.   *Id.*   Plaintiff's order for front handcuffing was renewed for one year by Dr. Colin Ottey in July 2012.   *Id*. at 4.

In September 2012, plaintiff was advised that the Warden and the Chief of Security at NBCI had "banned the practice of front cuff[ing]."   *Id.*   Thereafter, plaintiff "was forced to place his hands behind his back subjecting him to severe pain."   *Id*. at 4.   He states that he filed numerous sick calls informing medical staff of the violation of his medical orders.   *Id.*

Plaintiff further indicates that he filed a grievance in January of 2013 complaining of the violations of his medical orders and also advised Dr. Ottey that he should inform his supervisor that prison personnel were interfering with his "medical prescriptions."   *Id.*   Plaintiff states that Dr. Ottey failed to do so. *Id*.

In July of 2013, plaintiff was evaluated by Dr. Joubert, who noted that "plaintiff had a very limited range of motion in his left arm."   *Id.*   Dr. Joubert ordered an x-ray, an MRI, and provided a "permanent" order for front handcuffing.   *Id*. Plaintiff maintains that defendants continued to refuse to comply with the medical order, in violation of plaintiff's rights.   *Id*. at 5.

Moreover, he claims that other inmates are "allowed to be front cuffed and transported throughout the prison." *Id.*

Defendants do not dispute that plaintiff suffers from an injury to his shoulder and has been provided a medical order for front handcuffing. ECF 15-2 at 3-10 (medical records).

Defendants maintain, *inter alia*, that plaintiff failed to exhaust administrative remedies regarding the cuffing procedures. On January 28, 2013, plaintiff's ARP NBCI-0208-13 (complaining of the failure to comply with his order for front handcuffing) was dismissed and plaintiff failed to file an appeal to the Commissioner. ECF 15-2 at 11-15. On the same date plaintiff's ARP NBCI-0209-13 (also dealing with front handcuffing) was received and dismissed as repetitive. *Id.* at 16-17. Again, plaintiff did not appeal. On February 4, 2013, Pevia filed another ARP complaining of the handcuffing issue, ARP NBCI-0250-13, which was also dismissed as repetitive. *Id.* at 18-19. Plaintiff filed an appeal of this denial with the Commissioner. *Id.* at 20. The appeal was dismissed, pending resubmission. Plaintiff was directed to provide a copy of ARP NBCI-0208-13. *Id.* Plaintiff's ARP NBCI-2329-13, dated August 22, 2013, was also dismissed as repetitive and plaintiff failed to appeal. *Id.* at 21-22.

Defendants also claim that the treatment of plaintiff is legal and in accordance with NBCI policies. Through the Declaration of Major Ronald Stotler, the 7 to 3 Shift Commander at NBCI, defendants aver that NBCI is Maryland's highest security prison. Moreover, its Housing Unit 1, where plaintiff resided, contains inmates on disciplinary segregation and those who have demonstrated a propensity for violence, assaultive behavior, and an inability or unwillingness to comply with the rules and regulations of the prison system. ECF 15-3 at 1-2 (Declaration of Major Stotler).

Stotler avers that on August 30, 2012, Keith Arnold, Chief of Security at NBCI, issued a memorandum adopting strict handcuff procedures which were applied to all inmates on segregation.  The directive superseded medical orders for handcuffing Housing Unit 1 inmates. *Id*. at 2.

Stotler recounts that, prior to the adoption of the new policy, there were several instances in Housing Unit 1 where inmates who had been cuffed in front due to medical orders "took advantage of it to assault their correctional escorts while out of their cells."  ECF 15-3 at 2. Stotler explains that handcuffing in front "facilitates" an inmate's ability to attack another person because "the inmate is free to swing his arms with great force, creating a danger not only to staff but to himself, as force is used [by correctional staff] to subdue him and regain order and discipline." *Id*.

Arnold's memorandum regarding the new procedures provided that Housing Unit 1 inmates be cuffed behind the back when removed from their cells for short periods of time and for movement within the housing unit.  *Id.*; *see also* ECF 15-2 at 15.  For short movement within Housing Unit 1, inmates with medical orders for front cuffing are now cuffed behind the back, using "oversized cuffs" that have a "much longer chain between the wrists to make the cuffs more comfortable for the inmates." ECF 15-3 at 2.[3]  The longer chain allows the inmates' hands to rest on their buttocks, and their arms and shoulders are not pulled backward.  *Id*.  Stotler asserts:  "Cuffing behind the back makes it very difficult, if not impossible, for the inmate to assault staff by swinging his arms violently." *Id*.  For longer periods of time, however, including escorts off the Unit, inmates are cuffed in front, using three-point restraints that "minimize the movement of the arms and hands due to the use of a waist chain and black box." *Id*.

---

[3] It is unclear from the record when the use of the handcuffs with a longer chain came into use relative to Arnold's memorandum.

Some latitude is provided to staff, however.  Division of Corrections Directive 110-6, VI. C. 3 and 4 provides that inmates on disciplinary segregation "shall be handcuffed behind the back at all times during escort," but inmates "may be handcuffed in the front" as determined by the administration on a case-by-case basis.  ECF 15-3 at 3.  According to Stotler, "[a] medical order for front cuffing does not supersede the decision of custody [staff]."  *Id*.  He explains: "Housing unit managers retain discretion to authorize cuffing in front in a case of an obviously serious medical condition, in which it is apparent that cuffing behind the back, even with the much longer chains, will be painful or impractical, such as in cases of post-surgery recovery. . . ."  *Id*.

According to Stotler, "Pevia is considered dangerous. . . ."  *Id.*  He recounts that plaintiff has been found guilty of assaulting correctional staff as well as other inmates.  ECF 15-3 at 3; *see also* ECF 15-2 at 23-42, 45-51, 61-86.  According to defendants, the nature of plaintiff's current offense, second-degree murder and child abuse, for which he is serving a 60-year sentence, ECF 15-2 at 42, coupled with his history, necessitated his being handcuffed from behind.

For example, while previously incarcerated at Roxbury Correctional Institution on September 30, 2011, Pevia "severely slashed another inmate, Jesse James Snead."  ECF 15-1 at 7 (citing ECF 15-2 at 23-40).  As a result, he was elevated to maximum security and transferred to NBCI.  ECF 15-1 at 7 (citing ECF 15-2 at 41).  Then, on April 16, 2012, while at NBCI, he assaulted CO II Joshua Kennell.  ECF 15-1 at 7 (citing ECF 15-2 at 76-86).  Other violent incidents are also recounted by defendants.

### Standard of Review

Defendant's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF No. 12. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v.U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[4]

As noted, in this case, plaintiff was informed of his right to respond to the motion, and was advised that it could lead to dismissal of his case. ECF 16. He responded to the motion. ECF 17.

---

[4] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).  And, "to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied

"where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Plaintiff has not filed an affidavit under Rule 56(d).  However, he did file a motion for production of documents seeking copies of his entire medical record; various videos from August and September of 2013, showing his transport with handcuffs behind his back; videos of other inmates cuffed in front; and "Any and all rules, regulations and policies of the Maryland Department of Corrections about following Dr.s [sic] Orders once prescribed." ECF 18.  He also

filed a motion in which he asked the court to hold ECF 15 in abeyance, indicating that he could not adequately respond to the motion without engaging in discovery.  ECF 19.  I directed defendants to provide plaintiff with access to his medical records.  ECF 20.  However, I determined that plaintiff failed to explain how the requested discovery would aid him in responding to the dispositive motion.  Because there was no indication that any of the requested materials/information would create a genuine issue of material fact, plaintiff's motions were denied. ECF 20.   And, plaintiff's medical records have been submitted by defendants as an exhibit to the motion.  In this regard, it is salient that defendants do not challenge plaintiff's medical condition.

In light of the foregoing, I am satisfied that it is appropriate to address the defendants' motion as one for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.,* 475 U.S. 574, 586 (1986).

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in [his] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the court may not make credibility determinations on summary judgment. *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Generally, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See, e.g.*, *Boone v. Stallings*, _____ Fed. App'x. _____, No. 14-6521 (4th Cir. Sept. 11, 2014) (per curiam). However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.

*Id.* at 248.  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Nevertheless, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation*, 477 U.S. at 323–24).

## Discussion

### A.  Exhaustion of Administrative Remedies

The court must first examine defendants' assertion that plaintiff's claims should be dismissed due to plaintiff's failure to exhaust available administrative remedies.  The Prisoner Litigation Reform Act ("PLRA") provides, in pertinent part, 42 U.S.C. § 1997(e):

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular

11

episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendant(s). *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

Defendants have made a showing of failure to exhaust by plaintiff. Therefore, his complaint must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or that defendants have forfeited their right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003).

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has made an administrative remedy procedure "available" to Maryland state prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against   . . . official[s] or employee[s] of the Division of Correction ["DOC"]." Md. Code (2008 Repl. Vol., 2011 Supp.), § 10-206(a) of the Correctional Services Article ("C.S."); *see generally* C.S. §§ 10-201 *et seq*. Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." Code of Maryland Regulations ("COMAR") 12.07.01.01B(8).[5]

---

[5] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id*. at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for

In the Maryland correctional system, if the particular institution in which an inmate is incarcerated provides an administrative remedy procedure, the inmate must complete the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D.

Filing a request for administrative remedy with the Warden of the Maryland prison in which one is incarcerated is the first of three steps in the Administrative Remedy Procedure process provided by the Division of Correction to its prisoners. If this request is denied, the prisoner has ten calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Inmate Grievance Office ("IGO"). *See* COMAR 12.07.01.03; 12.07.01.05.B; *see also* C.S. § 10-206. Complaints are reviewed preliminarily by the IGO. *See* C.S. § 10-207; COMAR 12.07.01.06. If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1). The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge

---

public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

with the Maryland Office of Administrative Hearings.   *See* C.J. § 10-208(c); COMAR 12.07.01.07-.08.  The conduct of such hearings is governed by statute.  C.S. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination.   However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge.  *See* C.S. § 10-209(b)-(c).

In either event, the final agency determination is subject to judicial review in Maryland state court, so long as the claimant has exhausted his/her remedies.  *See* C.S. § 10-210.  But, an inmate need not seek judicial review in state court in order to satisfy the PLRA's administrative exhaustion requirement.  *See*, *e.g.*, *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court."), *cert. denied*, 537 U.S. 949 (2002).

As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, *supra,* 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).  If defendants show that a claim is subject to the ARP process but has not been exhausted, the court may not consider the merits of the claim.  *See Jones v. Bock*, 549 U.S. at 220; *see also Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.  *Chase*, 286 F. Supp. 2d at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust,

where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Administrative remedies must, however, be available to the prisoner, and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). The Fourth Circuit has addressed the meaning of "available" remedies in *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008):

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

Here, plaintiff filed a series of ARPs regarding the handcuffing procedures and the failure of prison staff to abide by his medical orders. All of the ARPs were either denied or dismissed. ECF 15-2 at 11-14, 16-19, 21-22. Plaintiff only noted an appeal as to ARP NBCI-025-13. That

appeal was dismissed for procedural reasons, however.  Plaintiff was instructed to resubmit the ARP with additional information but failed to do so.  ECF 15-2 at 20.

Plaintiff asserts that he did not receive notification that he needed to resubmit ARP NBCI-025-13 until March 12, 2013, three days after the time for submitting the additional information expired.  ECF 17.  Plaintiff filed affidavits from two other inmates indicating recurrent problems with the processing of inmate mail.  Plaintiff's exhibits 1, 2.[6]  He also states that, nonetheless, he resubmitted the appeal and advised headquarters of the delay in receiving the notice requiring him to resubmit his appeal.  *Id.* at 2-3; Ex. 5 (appeal, dated 2/13/13); Ex. 6 (letter from plaintiff dated 3/12/12).  Plaintiff indicates that he did not receive a response from headquarters and therefore he filed a grievance with the IGO.  His grievance was dismissed, because the IGO claimed he had not filed a proper appeal.  Exh. 3 (letter from IGO); Exh. 4 (2nd page of IGO letter).

Plaintiff indicates that he exhausted his "available" remedies.  I agree.  It appears that any failure by plaintiff to exhaust his remedies was occasioned by delay and mishandling of plaintiff's mail. As such, I do not find that plaintiff's complaint must be dismissed for failure to exhaust administrative remedies.

**B.  Eighth Amendment Claim**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of  its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (*citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

---

[6] As of this writing, plaintiff's exhibits have not been electronically filed on the docket.

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Jackson v. Lightsey*, ____ F.3d ____, no. 13-7291, Slip op. at 15 (4th Cir. Dec. 18, 2014).  A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Moreover, in a case involving a claim of deliberate indifference to a medical need, the inmate must show a "significant injury."  *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Inmates may also state an Eighth Amendment claim as to the conditions under which they are confined. Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981).  However, conditions that are merely restrictive, or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society."  *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that "the deprivation of [a] basic human need was *objectively* 'sufficiently serious,'" and that "*subjectively* 'the officials act[ed] with a sufficiently culpable state of mind.'"

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citations omitted).

"These requirements spring from the text of the amendment itself; absent intentionality, a

condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d at 238 (*citing Wilson*, 501 U.S. at 298-300).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U. S. at 298. "In other words, 'the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.'" *Brown v. North Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir.2002)). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly established pre-existing law. *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993); *see Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, *supra*, 330 F.3d at 634.

Defendants' actions are not actionable unless, "in light of preexisting law the unlawfulness of those action is apparent." *Iko v. Shreve*, *supra*. 535 F. 3d at 238 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require of such officials the legal knowledge culled by the collective hindsight of skilled lawyers and learned judges, but instead

only the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct." *Johnson v. Caudill*, 475 F. 3d 645, 650 (4th Cir. 2007).

The instant case does not concern the quality of medical care provided to plaintiff. Rather, it concerns an allegation that correctional staff ignored valid medical orders.

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). "Section 1983 liability on the part of the supervisory defendants requires a showing that: (1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn,* 896 F.2d 848, 854 (4th Cir. 1990) (internal citations omitted); *see also Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir. 1984).

Plaintiff fails to meet the first prong of an Eight Amendment claim. Even if plaintiff had a medical need for the front cuffing order, it is not the type of condition for which a layperson would have easily recognized that handcuffing him from behind with a single set of handcuffs, or with the lengthened chain that was ultimately provided, would be an obvious cause of pain. For example, plaintiff was not suffering from a dislocated shoulder or broken arm at the relevant times. There is simply no evidence that plaintiff's front cuffing orders were medical orders issued to treat a serious medical need. Plaintiff provides no medical conclusions of a clinician, expert reports, or medical records to support any claim that a lack of front cuffing for the short transfers on the tier constituted deliberate indifference to his medical needs.

Nor is there evidence that plaintiff suffered any real harm as a result of defendants' actions. Plaintiff asserts that the refusal to handcuff him in front on several occasions caused him physical pain.  Plaintiff does not show that he was in any apparent distress on the occasions he was not handcuffed in front.  Rather, he indicates that he advised the officers of his front cuffing order, they ignored it, and thereafter he complained of pain.  The medical records do not show that plaintiff sought medical treatment as a result of his being injured by the prison staff's refusal to comply with medical orders for front cuffing order.

Even assuming that the objective component of the Eighth Amendment violation were satisfied, plaintiff  has not alleged facts sufficient to establish the subjective component—that defendants acted with a culpable state of mind.   There is no evidence that prison officials demonstrated obduracy or wantonness.  Rather, the record reflects good faith reliance on a clear and justifiable security directive.  *See Wilson,* 501 U.S. at 298–99.  As the Court noted in *Whitley v. Albers,* 475 U.S. 312, 321-22 (1986) (citation omitted):

> "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." That deference extends to ... prophylactic or preventive measures intended to reduce the incidence of ... breaches of prison discipline.

The denial of front cuffing was not left to the discretion of correctional personnel or applied on an ad-hoc basis.  On the whole, it was uniformly applied to all segregation inmates, with limited exceptions.  Chief of Security Keith Arnold revised the procedure for handcuffing inmates escorted from their cells in Housing Unit 1, following several instances where inmates who had been cuffed in front pursuant to medical orders used the opportunity of having their hands in front of them to assault officers who were escorting them. In response to the assaults, Arnold issued a memorandum requiring that all inmates in Housing Unit 1, including those with

medical orders for front cuffing, be cuffed behind their backs when removed from their cells for short periods of time and for movement within the housing unit. Inmates with medical orders for front cuffing are, however, accommodated through use of cuffs with a much longer chain between the wrists, making it possible for their hands to rest on their buttocks and avoiding a rearward pull of their arms and shoulders. When Housing Unit 1 inmates are removed from their cells for longer periods of time, they are restrained using three-point restraints. The use of the three-point restraints minimizes the inmate's ability to move his arms and hands because the handcuffs are attached to a waist chain and black box.

Although housing unit managers retain discretion to authorize front-cuffing in cases of obviously serious medical conditions, which would make cuffing behind the back painful or impractical, it is correctional policy that all disciplinary segregation inmates must be handcuffed behind their back at all times during escort. Defendants assert that medical orders do not supersede security decisions. There are no allegations that suggest the officials acted in anything but good faith to maintain order on the tier and protect inmates and officers from risk of assault. Defendants' restriction thus does not constitute a constitutional violation for it was justified, as discussed above. *See Turner v. Safley,* 482 U.S. 78 (1987) (holding that a prison regulation which impinges on an inmate's constitutional rights is valid if it is reasonably related to legitimate penological interests).

Plaintiff cannot meet his burden on his Eighth Amendment claim. Thus, defendants are entitled to summary judgment in their favor. A separate Order follows.


January 29, 2015  
Date

_____/s/_____  
Ellen L. Hollander  
United States District Judge

21